### THE BRIDGETON.

(District Court, S. D. New York. January 20, 1915.)

COLLISION ⬤⇒95—VESSELS LEAVING AND APPROACHING PIERS—NEGLIGENT SPEED.

A collision in North River in the daytime, between a steam lighter approaching a pier and a car float in tow of a tug which came out of a nearby slip, *held* due solely to the fault of the tug in proceeding from the slip at too great speed and maneuvering her float too close to its mouth.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. ⬤⇒95.]

In Admiralty. Suits for collision by the North & East River Terminal Company, owner of the steam lighter Varina, and by William Gaffney, owner of her cargo, against the steam tug Bridgeton. Decree for libelants.

Armstrong & Brown, of New York City, for libelant North & East River Terminal Co.

Foley & Martin, of New York City, for libelant Gaffney.

James J. Macklin, of New York City, for claimant.

HAZEL, District Judge. The collision complained of in the libels filed by the bailee of the cargo and by the owner of the injured vessel occurred on the 28th day of February, 1913, in the daytime, while the tide was at ebb, in the North River, between the steam lighter Varina and a car float in tow of the tugboat Bridgeton. The injured vessel, which was bound for the coal dock at Pier 9, was struck on her port bow, and her stem was broken, and she almost immediately sank; her crew being rescued with the assistance of a rowboat. The tugboat concededly had the right of way. She was heading up the river, having just emerged from between Piers 7 and 8, and was intending to pass close to Pier 7 to avoid the effect of the ebb tide. The car float was swinging, and before the swing could be checked the collision ensued.

In my judgment the evidence of libelant preponderatingly shows that the tug Bridgeton was at fault, in that she proceeded in the slip

---

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

at too great speed after leaving her dock, and maneuvered in swinging the car float too close to the mouth of the slip. Her mate swore that when she was close to the end of Pier 7 he was standing on top of a car on the car float, and that on the instant he saw the Varina he notified the master of the tug, who was not in a position to see her, of her presence, and that immediately a one-blast signal was blown, to which the Varina, which was then about 300 feet out in the river, replied with one blast. The Varina properly starboarded, stopped her engines, and steadied, pointing to Pier 7. But when the master of the Bridgeton himself perceived the Varina approaching, believing that he could not promptly stop the swing of the car float which he had already initiated, he blew another signal, one of two blasts, with the intention of directing the Varina to divert her course out into the river, so that the car float would avoid hitting her. It was, however, too late to avoid the collision, and, although the Varina immediately reversed, she was carried on the ebb tide and into the car float, head on.

The account of the accident by a witness for the respondent differs in important particulars from libelant's version; it being claimed that, after first exchanging signals with the Bridgeton, the Varina sheered over towards Pier 7, instead of standing away from it, and turned out into the river at right angles to the pier for a distance of about 300 feet, when she circled about and ran into the car float. This claim and the arguments in connection therewith have been carefully examined by me, but do not in my opinion prove that the Varina was in fault for the collision. On the contrary, the evidence, as already indicated, is that the tug Bridgeton, after inviting the Varina to pass on her port side, to which the latter assented, maneuvered too close to Pier 7 in such a way as to sheer to the left towards the Varina, which was maintaining her course and endeavoring to pass in the manner agreed upon.

The witness McNichols, master of the Flemington, bound for the slip from which the Bridgeton was emerging, substantially testified that the float was between 30 and 40 feet below the end of Pier 7 when the Bridgeton started a sheering movement to port, which, I think, made it impossible, in view of the position of the Varina, to avoid the accident. Such testimony finds corroboration in the narratives of other witnesses for the libelant. The master of the Bridgeton displayed carelessness and laxness in navigation in starting out at so great a rate of speed, in going so close to Pier 7, in endeavoring to swing the car float at a time when he was unable to see or judge his proximity to other boats, and in failing to pass the Varina port to port in accordance with his agreement as indicated by the signals, and therefore the principal liability for the collision must fall solely upon the Bridgeton.

It was also urged by counsel for the respondent that the speed of the Varina in approaching the pier was excessive, that she was navigated too close to Pier 7, and that she failed to hear the slip signal which she should have heard; but the evidence, I think, does not establish negligence on her part, the admission of the master of the Varina of failure to hear the slip signal blown by the Bridgeton on

leaving the dock not being sufficient to incriminate the vessel commanded by him. In any event, it is doubtful whether the bend signal rule is applicable, in view of the fact that passing signals, which were thoroughly understood, were soon afterwards exchanged.

A decree for libelants, with costs, may therefore be entered, holding the Bridgeton solely responsible for the damage sustained by the Varina as the result of said collision.